IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| ANTHONY GADSDEN,<br><br>Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION,<br><br>Defendant. | CASE NO. 1:25-cv-2741<br><br><br>MAGISTRATE JUDGE JAMES E. GRIMES JR.<br><br><br>**MEMORANDUM OPINION AND ORDER** |

Plaintiff Anthony Gadsden filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying supplemental security income. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The parties consented to my jurisdiction in this case. Doc. 4. Following review, and for the reasons stated below, I reverse the Commissioner's decision.

**Procedural history**

In June 2023, Gadsden filed an application for supplemental security income, alleging a disability onset date of June 1, 2017.[1] Tr. 15, 260. In his application, Gadsden claimed disability due to glaucoma, spinal tumor,

---

[1]    "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

Axenfeld Rieger syndrome,[2] heart aneurism, and feet issues. Tr. 298. The Social Security Administration denied Gadsden's application and his motion for reconsideration. Tr. 73, 82. Gadsden then requested a hearing before an Administrative Law Judge (ALJ). Tr. 116.

In March 2025, an ALJ held a hearing, during which Gadsden and a vocational expert testified. Tr. 35–72. The next month, the ALJ issued a written decision finding that Gadsden was not disabled. Tr. 15–29. The ALJ's decision became final on October 21, 2025, when the Social Security Appeals Council declined further review. Tr. 1–3; *see* 20 C.F.R. § 404.981.

Gadsden filed this action on December 18, 2025. Doc. 1. He asserts the following assignments of error:

> 1. Whether the ALJ properly evaluated the opinion of consultative examiner, Dr. Dariush Saghafi.
>
> 2. Whether the ALJ's assessment of RFC is supported by the evidence.

Doc. 9, at 1.

**Evidence**

*Personal and vocational evidence*

Gadsden was 25 years old on the date he filed his application. Tr. 27. He attended college for two years and has no past relevant work. Tr. 28, 44.

---

[2]     Axenfeld-Rieger syndrome is a rare genetic condition that affects eye development and commonly causes glaucoma. *See* Axenfeld-Rieger Syndrome, Cleveland Clinic (https://my.clevelandclinic.org/health/diseases/24093-axenfeld-rieger-syndrome) (last visited July 23, 2026).

2

*Relevant medical evidence*

On January 26, 2022, Gadsden underwent a thoracic laminectomy with resection of a neurenteric cyst[3] from his thoracic spine "and dural repair." Tr. 436, 448. The cyst was "severely compressing" Gadsden's spinal cord, and the surgeon described a complex removal and restoration process. Tr. 448–49.

Four days later, Gadsden underwent repair surgery for a cerebrospinal fluid leak. Tr. 495. After this procedure, Gadsden "remain[ed] neurologically stable" compared to his pre-surgical condition, "with significant paraparesis [of] both lower extremities." Tr. 495.

On February 2, Gadsden was transferred to University Hospitals because his surgeon was concerned that he "would require further management of diastematomyelia,"[4] which the surgeon noticed during surgery. Tr. 1037. Gadsden denied positional headaches or any drainage from his incision. Tr. 1037. An MRI showed postoperative changes indicating "at least partial decompression of the previously noted large … cystic lesion." Tr.

---

[3] A neurenteric cyst is a rare lesion commonly found in the spinal cord. "Surgical intervention is the primary therapeutic approach for patients with [a neurenteric cyst, particularly those experiencing symptoms." *See* Neurenteric cysts, National Library of Medicine (https://pmc.ncbi.nlm.nih.gov/articles/PMC12513402/) (last visited July 23, 2026).

[4] Diastematomyelia is a rare congenital spinal cord condition in which the cord is split. Symptoms vary, as does treatment. *See* Diastematomyelia, National Institute of Health (https://rarediseases.info.nih.gov/diseases/1851/diastematomyelia) (last visited July 23, 2026).

1035. There was fluid collection along the laminectomy bed and "persistent marked narrowing of the thecal sac within the spinal canal," including "marked flattening of the thoracic spinal cord/cord compression." Tr. 1035. "[V]ague increased signal … through this region suggest[ed] underlying myelomalacia and/or cord edema." Tr. 1035. Lumbar spine imaging could not be obtained due to Gadsden experiencing pain during the thoracic MRI. Tr. 1034.

The doctor discharged Gadsden on February 5, 2022. Tr. 1040. Gadsden was to perform "activity" and "weight-bearing" as tolerated, but he was not to lift more than ten pounds or engage in "pulling or pushing activity until cleared by [the doctor] at follow-up" Tr. 1040.

Gadsden participated in physical therapy to improve his leg strength, balance, and gait. Tr. 1488. In June 2022, he reported that his pain was "good" that day and he was compliant with his home exercise program. Tr. 1488.

In January 2023, Gadsden saw podiatrist Amanda Meszaros, DPM. Tr. 2195. The last time Gadsden saw Dr. Meszaros was before his back surgery, when Dr. Maszaros fitted Gadsden with orthotics "for progressive difficulty walking." Tr. 2195. At his January 2023 visit, Gadsden reported improved sensation in his feet. Tr. 2195. Gadsden "still ha[d] residual weakness in his feet" and asked for "new inserts." Tr. 2195. Gadsden's foot exam showed posterior tibial tendon strength rated "3/5" with supination, "[p]rofound and complete loss of medial longitudinal arch height," limited range of motion of

4

the ankle and subtalar joint, and a "rigid pronation deformity." Tr. 2195. Gadsden's legs were "externally rotated" and he was unable to perform a heel rise due to instability. Tr. 2195. Gadsden had "4 out of 5" strength in "all other [muscle] groups tested. Tr. 2195. Dr. Meszaros commented that Gadsden had a "shuffling gait pattern" with "[k]nee flexion throughout [his] gait cycle." Tr. 2195. She diagnosed an abnormal gait and, in both feet, "acquired deformities" and congenital flat feet. Tr. 2195–96. Dr. Meszaros recommended custom silicone ankle-foot orthotics. Tr. 2196.

In October 2023, Gadsden saw neurologist Dariush Saghafi, MD, for a consultative exam. Tr. 2209–11. Gadsden's chief complaint was "[e]ye problems." Tr. 2209. Gadsden also reported "feet issues" and "tumor on spine impairing ability to walk." Tr. 2209. He said that his ocular impairment caused distant items to appear blurry and compromised peripheral vision. Tr. 2209. Gadsden reported head pressure and headaches which lasted a couple of minutes. Tr. 220. Gadsden said that he was recovering from his cyst resection and said that the cyst caused "an inability to walk about 3 years ago." Tr. 2209. He reported falling weekly due to tripping from weak leg muscles. Tr. 2209. Gadsden said that he couldn't "catch himself properly when he loses balance." Tr. 2209.

On exam, Gadsden exhibited "+4/5" strength in his lower extremities and full strength in his upper extremities. Tr. 2210–11. His muscles showed no signs of focal atrophy and normal tone and bulk. Tr. 2210. Gadsden had

5

intact sensation. Tr. 2211. His gait was "myopathic,"[5] "with inability to fully extend the torso using his knees due to extensor weakness with predisposition to falls due to buckling of the knees." Tr. 2211. Dr. Saghafi's impression was that Gadsden "suffers mostly from ocular complications," including "moderately poor central and peripheral acuity." Tr. 2211. Gadsden's abnormal gait was due to his "recent cyst removal … but he is convalescing and improving from this complication." Tr. 2211. However, Dr. Saghafi wrote, Gadsden "still is a falls risk and reports falling weekly." Tr. 2211. Dr. Saghafi found that Gadsden can:

> lift, push, and pull sufficiently to be able to perform ADLs but gait is unstable. The claimant is poorly able to bend, walk, and stand for up to ½ block. The claimant is able to understand the environment as well as peers and communicate satisfactorily. The claimant is able to travel independently. He is unable to drive a vehicle and needs assistance getting around due to poor vision.

Tr. 2211.

In November 2023, Gadsden underwent a psychological evaluation, and the doctor observed that he walked without assistance but had "a significant limp." Tr. 2219.

---

[5]    A myopathic gait, also described as a "waddling gait," is due to hip girdle weakness causing the pelvis to tilt while walking. *See* Gait Abnormalities, Stanford Medicine (https://med.stanford.edu/stanfordmedicine25/the25/gait.html) (last visited July 23, 2026).

In January 2024, Gadsden saw his primary care doctor Deon Regis, MD, for an annual exam. Tr. 2223. Gadsden reported "recent[]" depression. Tr. 2223. He didn't want to start medication at that time but was open to counseling. Tr. 2223. Gadsden also reported "a long history of snoring," sleep apnea, and fatigue, and expressed interest in undergoing a sleep study. Tr. 2223. On exam, Gadsden had normal coordination, muscle tone, and reflexes. Tr. 2227. Dr. Regis provided Gadsden with referrals for counseling and a sleep study. Tr. 2229.

In January 2025, Gadsden saw Dr. Regis for a wellness exam. Tr. 2315. Gadsden reported lower back pain, described as "a grinding sensation," "that began suddenly, with some numbness and tingling." Tr. 2316. Stretching was only partially effective in reducing this pain. Tr. 2317. Gadsden said that he "continue[d] to experience balance issues and foot pain." Tr. 2317. Stretching and balancing exercises helped him with stair climbing. Tr. 2317. On exam, Gadsden had lumbar spine tenderness, normal range of motion, normal muscle tone, no spasms or edema, and negative straight-leg-raise testing.[6] Tr. 2319. He had normal reflexes and coordination. Tr. 2319. Dr. Regis referred Gadsden to neurology and neurosurgery to evaluate and manage Gadsden's lower back condition. Tr. 2316.

---

[6]     In a straight leg-raising test, the patient lies down, fully extends the knee, and lifts the leg. *See* Dorland's Illustrated Medical Dictionary, at 1871 (33rd ed. 2020). Leg pain when raising the leg 30–90 degrees is a positive test and indicates lumbar radiculopathy. *Id*.

In February 2025, Gadsden saw neurologist Darshan Mahajan, MD, for a new patient evaluation. Gadsden said that he hadn't had a neurology appointment since his surgery in January 2022. Tr. 2298. He reported having difficulty with balance and reported a history of falls with tripping and sometimes not being able to control his legs well. Tr. 2298. On exam, Gadsden had normal muscle tone and mass and full strength in his upper and lower extremities. Tr. 2301. He had intact coordination and sensation. Tr. 2301. Gadsden was "cautious when he walk[ed]" and had a slightly broad-based gait. Tr. 2301. He could walk on his toes and heels. Tr. 2301. Dr. Mahajan assessed "Rieger anomaly," an ataxic gait,[7] and "unsteadiness on feet." Tr. 2301. He wrote that Gadsden was doing relatively well. Tr. 2301. Dr. Mahajan advised Gadsden to do his exercises regularly and attend his upcoming physical therapy appointment. Tr. 2302. Gadsden was to follow up in one month. Tr. 2302.

A few days later, Gadsden saw Physician Assistant Ryan Milks at the University Hospitals Spine Institute Department of Neurological Surgery. Tr. 2305. A note from that appointment states that Gadsden was "[l]ost to follow-up secondary to insurance issues" since his 2022 surgery. Tr. 2305. Gadsden "ha[d] been progressing minimally with strength and coordination in the

---

[7]    An ataxic gait is described as "clumsy, staggering movements with a wide-based gait." *See* Gait Abnormalities, Stanford Medicine (https://med.stanford.edu/stanfordmedicine25/the25/gait.html) (last visited July 23, 2026).

interim" but felt that he has plateaued. Tr. 2305. He rated his back pain and bilaterial sciatica a "6/10," and described his sciatica as radiating posteriorly through his thighs to his ankles, with pain on his left side being greater than his right. Tr. 2305–06. On exam, Gadsden's motor strength was "4/5" with bilateral hip extension and knee flexion, and "5/5" in all other areas. Tr. 2306. Gadsden had normal and symmetrical muscle bulk in all his extremities. Tr. 2306. His knees exhibited an overactive reflex response, and he had lumbar paraspinal tenderness and muscle spasms. Tr. 2306–07. Milks ordered an MRI and referred Gadsden to aquatic therapy. Tr. 2307.

*State agency opinions*[8]

In November 2023, Bradley Lewis, MD, reviewed Gadsden's record. Tr. 77–80. Regarding Gadsden's residual functional capacity,[9] Dr. Lewis found that Gadsden could lift and carry 20 pounds occasionally and 10 pounds frequently. Tr. 78–79. He could stand and walk for four hours and sit for six

---

[8] When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

[9] An RFC is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

hours. Tr. 79. Gadsden could occasionally climb ramps and stairs, balance, stoop, crouch, and crawl, and he could never climb ladders, ropes, or scaffolds. Tr. 79. He must avoid all exposure to hazards. Tr. 79.

In March 2024, Maria Maxwell, MD, reviewed Gadsden's record and agreed with Dr. Lewis's findings. Tr. 88–89.

*Hearing testimony*

Gadsden, who was represented by counsel, testified at the telephonic administrative hearing. When asked to describe why he was unable to work, Gadsden stated that it was difficult for him to get around on a regular basis. Tr. 48. He usually has a walking stick or cane with him. Tr. 48. His balance is off, which effects his ability to bend down and pick things up. Tr. 48. It takes him longer to do things. Tr. 48.

Gadsden also stated that he doesn't have very good peripheral vision. Tr. 49. He has difficulty walking due to his feet. Tr. 49. He stumbles a lot. Tr. 49. Over the "past week and weekend" he fell twice. Tr. 49–50.

When asked about treatment for his conditions, Gadsden said that the only treatment he receives are eyedrops for his glaucoma. Tr. 50. His glaucoma causes eye pressure, which sometimes causes headaches. Tr. 49. Gadsden reads books on a tablet so he can enlarge the text. Tr. 54.

Gadsden testified that he washes dishes, but he has to take a half-hour break to sit down. Tr. 50. It would be difficult for him to balance and stand still for one hour. Tr. 50. Gadsden estimated that, on a good day, he could stand for

10

about a half an hour. Tr. 59–60. He doesn't do laundry because he can't bend down to lift the basket up without stumbling and spilling the contents. Tr. 50. Gadsden can vacuum because he leans on the vacuum when doing so. Tr. 51.

Gadsden said that he used a cane or walking stick about four days a week, depending on how achy his body felt when he woke in the morning. Tr. 58. He estimated that on days that he needs his cane, he could walk about a half a block before his back hurt and his legs wobbled. Tr. 59. Gadsden said that he could not comfortably lift and carry more than ten pounds. Tr. 60.

Gadsden stated that he wears his prescribed orthotics on days that he feels that he needs more support. Tr. 62. The orthotics attach to his upper legs, run down the back of his thighs to his feet, and restrict movement in his ankles. Tr. 62. They help a lot, although Gadsden still experiences pain while walking and doing other activities. Tr. 62.

The ALJ asked the vocational expert to determine whether a hypothetical individual with the same age, education, and work experience as Gadsden could perform work if the individual had the limitations purportedly assessed[10] in the ALJ's residual functional capacity determination, described

---

[10] The ALJ described to the vocational expert an individual who could lift and carry 20 pounds occasionally and 10 pounds frequently and stand and walk for four hours in an eight-hour day. Tr. 64–65. In her decision, the ALJ limited Gadsden to "sedentary work" and standing and walking for four hours. Tr. 22. But *sedentary work* involves lifting and carrying no more than 10 pounds and standing and walking no more than a third of the workday. *See* 20 C.F.R. § 416.967(a). So the ALJ's question to the vocational expert didn't match her residual functional capacity finding. On remand, the ALJ can fix this inconsistency or possible scrivener's error.

below. Tr. 64–65. The vocational expert answered that such an individual could perform the following jobs: order clerk, charge account clerk, and sorter. Tr. 65.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

> 1. The claimant has not engaged in substantial gainful activity since June 6, 2023, the application date (20 CFR 416.971 *et seq*.).
>
> 2. The claimant has the following severe impairments: degenerative disc disease/status post removal of a spinal cyst in January 2022, mild obesity, and Axenfeld-rieger syndrome and associated mild glaucoma in both eyes (20 CFR 416.920(c)).
>
> 3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).
>
> 4. The claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) except he can only stand or walk for four hours in an eight-hour period instead of six hours. The claimant's residual functional capacity has been further reduced in that he cannot climb ladders, ropes, or scaffolds or work around hazards (unprotected heights/dangerous machinery). In addition, the claimant has been limited to occasional balancing, stooping, crouching, crawling, and climbing of ramps and stairs.
>
> 5. The claimant has no past relevant work (20 CFR 416.965).

12

6.  The claimant was 25 years old, which is defined as a younger individual age 18–44, on the date the application was filed (20 CFR 416.963).

7.  The claimant has a high school education (20 CFR 416.964).

8.  Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

10. The claimant has not been under a disability, as defined in the Social Security Act, since June 6, 2023, the date the application was filed (20 CFR 416.920(g)).

Tr. 18–29.

**Standard for Disability**

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id*. "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id*. If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

14

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial evidence standard "is not high." *Id.* at 103. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 99.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v.*

15

*Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

Gadsden argues that the ALJ improperly evaluated Dr. Saghafi's opinion. Doc. 9, at 11.

The Commissioner is required to evaluate the persuasiveness of all medical opinions using the following factors: supportability; consistency; treatment relationship, including the length, frequency, purpose, and extent; specialization; and other factors. 20 C.F.R. §§ 416.920c(a), 416.920c(c)(1)–(5). Supportability and consistency are the most important factors. 20 C.F.R. § 416.920c(a). Supportability means that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion[] … the more persuasive the medical opinions … will be." 20 C.F.R. § 416.920c(c)(1). Consistency means "[t]he more consistent a medical opinion[] … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion[] … will be." 20 C.F.R. § 416.920c(c)(2). The Commissioner must explain the supportability and consistency factors when discussing a medical opinion. 20 C.F.R. § 416.920c(b)(2). "[A]n ALJ need not," however, "specifically use the terms 'supportability' or 'consistency' in his analysis." *Cormany v. Kijakazi*, No. 5:21-cv-933, 2022 WL 4115232, at *3 (N.D. Ohio Sept. 9, 2022) (citing cases). The Commissioner is not required to discuss the remaining

16

factors. *Id.* "A reviewing court evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Toennies v. Comm'r of Soc. Sec.*, 2020 WL 2841379, at *14 (N.D. Ohio June 1, 2020) (internal quotation marks and citation omitted).

The ALJ evaluated Dr. Saghafi's opinion as follows:

> I have also considered the opinions of the above-mentioned consulting physician who examined the claimant on a sole occasion on October 25, 2023. According to this source, the claimant "is poorly able to bend, walk, and stand for up to ½ block." These opinions are not persuasive because they are not well supported internally, and because the evidence taken whole, and the lack of evidence, does not support an inability to walk and/or stand for four hours in an eight-hour period, an assessment shared by the above-mentioned State agency physicians who reviewed this record (see, again, Exs. 2A and 4A).

Tr. 27.

Gadsen argues that the ALJ failed to "properly or meaningfully evaluate the 'supportability' of Dr. Saghafi's opinion." Doc. 9, at 14. He complains that the ALJ "concluded, without explanation, that Dr. Saghafi's opinion was 'not well supported internally,' yet failed to address the examination findings underlying that opinion." *Id.* Gadsden points out that Dr. Saghafi "documented decreased lower extremity strength, a myopathic gait, inability to fully extend the torso due to extensor weakness, knee buckling, and an ongoing fall risk with reported weekly falls." *Id.* (citing Tr. 2211).

17

The Commissioner submits that "[c]onsistent with the ALJ's analysis, Dr. Saghafi referred to gait problems that he observed but did not otherwise cite specific objective medical findings to justify the limitations he assessed…. Rather, Dr. Saghafi appears to have relied on [Gadsden's] own reports of 'falling weekly.'" Doc. 11, at 4. According to the Commissioner, the ALJ "reasonably found Dr. Saghafi's opinion less persuasive because it was inadequately supported and poorly explained." *Id*.

As an initial matter, the ALJ did not say anywhere in the decision that she discounted Dr. Saghafi's opinion because it was based on Gadsden's own reports or that Dr. Saghafi's findings were poorly explained. Tr. 27. The Commissioner's post-hoc rationalization is not an appropriate basis on which to uphold the ALJ's decision. *See Hicks v. Comm'r of Soc.* Sec., 909 F.3d 786, 808 (6th Cir. 2018) ("[A]n agency's actions must be upheld, if at all, on the basis articulated by the agency itself, and not based on appellate counsel's post hoc rationalization[s]") (internal quotation marks and citations omitted).

Moreover, Dr. Saghafi appears to have relied at least in part on Gadsden's myopathic gait when he assessed Gadsden as a fall risk:

> He also has a myopathic gait secondary to recent cyst removal from the spinal column which was causing spinal cord impingement but he is convalescing and improving from this complication, however, he still is a falls risk and reports falling weekly. The patient's central acuity and peripheral acuity are considered moderately poor. He also fixates with only one eye at a time and possesses a concomitant strabismus.

18

Tr. 2211 (Dr. Saghafi's report).

All the ALJ said was that Dr. Saghafi's opinion was "not well supported internally." Tr. 27. But as Gadsden points out, Doc. 9, at 14, on exam Gadsden had slightly reduced lower extremity strength and "a myopathic gait with inability to fully extend the torso using his knees due to extensor weakness with predisposition to falls due to buckling of the knees." Tr. 2211. These exam findings could support Dr. Saghafi's opinion that Gadsden is at-risk for falls and "is poorly able to bend, walk, and stand for up to ½ block." Tr. 2211. So the ALJ did not adequately explain her supportability analysis, and her reasoning is not apparent from the record. The Court is therefore unable to determine whether the ALJ's conclusion is supported by substantial evidence. *See, e.g., Goodman v. Soc. Sec. Admin.*, No. 1:22-cv-995, 2024 WL 623894, at \*15 (N.D. Ohio Feb. 14, 2024) (the ALJ's statement that an opinion is "not supported" "fails to 'explain how' the ALJ 'considered the supportability... factor'") (citing 20 C.F.R. § 416.920c(b)(2) (the Agency "will explain how [it] considered the supportability and consistency factors for a medical source's medical opinions")).

It is true, as the Commissioner asserts, that the ALJ cited Dr. Saghafi's exam elsewhere in the decision. Doc. 11, at 4 (citing Tr. 19–20, 23–26).[11] But

---

[11] Many of the ALJ's citations to Dr. Saghafi's opinion simply reference Gadsden's normal mental exam at Dr. Saghafi's evaluation. *See* Tr. 19–20, 24–26. Gadsden saw Dr. Saghafi for a physical exam. The ALJ's reference to Gadsden's normal mental exam is irrelevant to the ALJ's evaluation of Dr. Saghafi's opinion regarding Gadsden's physical impairments.

at none of these points did the ALJ supply the necessary explanation for the supportability factor. Moreover, the ALJ either miscited Dr. Saghafi's report or misstated the evidence in it. For instance, the ALJ cited in part Dr. Saghafi's exam in support of her statement that Gadsden was described as "neurologically intact, and having a normal gait, normal muscle strength, normal coordination, and normal reflexes (see Exs. 13F [Dr. Saghafi's exam]; 15F, p. 5; 19F, p. 10; 23F, p. 4; and 24F, p. 11)." Tr. 24. But at his exam with Dr. Saghafi, Gadsden did not have a normal gait or normal muscle strength. And the other records the ALJ cited neither show that Gadsden had a normal gait, nor support the ALJ's characterization of Gadsden's exam findings. *See* Tr. 2227 (Ex. 15F, p. 5) (gait and muscle strength not assessed); Tr. 2267 (Ex. 19F, p. 10) (same); Tr. 2320 (Ex. 24F, p. 11) (same); Tr. 2306 (Ex. 23F, p. 4) (showing "4/5" "motor strength" in hip extension and knee flexion and abnormal patella and Achilles reflexes with no gait assessment).

This mischaracterization of the evidence also means that the ALJ's finding that Dr. Saghafi's opinion was inconsistent with other evidence in the record showing that Gadsden could stand and walk for four hours a day, Tr. 27, is not supported by substantial evidence.

On remand, the ALJ will have an opportunity to reconsider all the evidence of record, including Dr. Saghafi's opinion, and provide further

explanation.[12]

**Conclusion**

For the reasons explained above, the Commissioner's decision is reversed and remanded for proceedings consistent with this opinion.

So ordered.

Dated: July 23, 2026

                      */s/ James E. Grimes Jr.*
                      James E. Grimes Jr.
                      U.S. Magistrate Judge

---

[12] Because the Court is reversing and remanding to the Agency on Gadsden's first assignment of error, there is no need to adjudicate Gadsden's second assignment of error.